**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BEVERLY FORD-GREENE, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  14-5846 |
| NHS, INC. (a/k/a NHS CHILDREN'S | : | |
| SERVICES AND NHS PHILADELPHIA), | : | |
| LORI PASTER, and RACHEL MAID | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                              May 20, 2015

Currently pending before the Court is the Motion by Defendants NHS Children's

Services and NHS Philadelphia ("Defendant NHS"), Lori Paster, and Rachel Maid (collectively,

"Defendants") to Dismiss Plaintiff Beverly Ford-Greene ("Plaintiff")'s Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6) and to Strike Paragraphs 20(d), 27–31, 34, and 45 of

the Complaint.  For the following reasons, the Motion to Dismiss is granted in part and denied in

part and portions of Paragraphs 20(d) and 30 are stricken from the Complaint.

## I.      FACTUAL BACKGROUND

Plaintiff is an African-American adult female who resides in Philadelphia County,

Pennsylvania.  (Compl. ¶ 3.)  At all relevant times, Plaintiff was an employee and former

employee with Defendant NHS.  (Id. ¶ 4.)  Plaintiff was hired by Defendant NHS as a Behavior

Specialist/Mobile Therapist on February 26, 2003 and was terminated on February 8, 2012.  (Id.

¶18.)

1

Defendant NHS is an entity engaged in an industry or activity affecting commerce and has over 300 employees nationwide for each working day during each of twenty or more calendar work weeks in the current or preceding year.  (Id. ¶ 5.)  Defendant Lori Paster is a white female who at relevant times worked for Defendant NHS as a manager and decision maker in NHS's BHRS Program, which operated out of various offices in Philadelphia, Pennsylvania.  (Id. ¶ 6.)  Defendant Rachel Maid is a white female who at relevant times worked for Defendant NHS as a manager and decision maker including as Plaintiff's direct supervisor in the BHRS Program.  (Id. ¶ 7.)

### A.  Plaintiff's Complaint Filed with the Pennsylvania Human Relations Commission

On February 10, 2012, Plaintiff filed a complaint against Defendant NHS with the Pennsylvania Human Relations Commission ("PHRC").  (Compl., Ex. A.)  In Count One of that complaint, for discharge and retaliation/discrimination, Plaintiff alleged that she opposed an unlawful practice as follows:

> On or about November 2011 I spoke to Kenya Barrett and informed that I was being discriminated against because of my race, African American, by Lori Paster, Assistant Director and Rachael Maid, Supervisor, both race white.  Ms. Barrett told me that she would look into my allegations and get back to me.  The persons who harmed me, Lori Paster and Rachael Maid, knew I filed a complaint because they were informed by Human Resources.  On February 8, 2012, I was [d]ischarged.

(Id. ¶¶ 8–10.)  Plaintiff also stated that she believed Defendant NHS's actions were retaliatory because "after [she] filed a complaint of discrimination against Lori Paster and Rachael Maid my work was scrutinized daily.  I was accused of not attending meeting [sic] and not communicating with the entire team and these accusations were not true."  (Id. ¶ 11.)

In Count Two of her complaint with PHRC, Plaintiff also alleged that she was discharged on the basis of racial discrimination, and stated the following:

> [NHS's] reason for the action taken was that I did not attend a meeting and I was late submitting a treatment plan. White employees were treated more favorably they did not submit their 30 day review on time and were not disciplined nor discharged. When white employees attended another supervisors [sic] group meeting they were not written up. White employees were not required to write an incident report when they were not present when a student was injured. White employees were excused from a case while I was kept on cases for longer periods of time.

(Id. ¶¶ 18–19.)

Two years later, on February 11, 2014, Plaintiff's counsel submitted an Amended Complaint with PHRC, which was stamped as received on February 19, 2014. (Defs.' Mot. Dismiss, Ex. 1.) The Amended Complaint "amends and supplements" Plaintiff's February 10, 2012 PHRC Complaint ("the 2012 Complaint") by incorporating the factual allegations of the 2012 Complaint and by amending Paragraph 3 of the 2012 Complaint to include Lori Paster and Rachel Maid as respondents. (Id.) No additional factual allegations are included in the Amended Complaint. Plaintiff's counsel signed the Amended Complaint, but Plaintiff neither signed nor verified it. (See id.) The Philadelphia District Office of the United States Equal Employment Opportunity Commission ("EEOC") issued a Notice of Charge of Discrimination to Defendants on April 17, 2014. (Id.) According to the Amended Certificate of Service, both Paster and Maid were served with copies of the Amended Complaint by first class mail on April 17, 2014. (Defs.' Mem. Supp. Mot. Dismiss, Ex. 1, Certificate of Service.)

On June 20, 2014, PHRC sent Plaintiff a letter advising her that it had investigated her complaint and determined that it should be dismissed for lack of probable cause to credit her allegations of unlawful discrimination. (Compl., Ex. B, PHRC Letter June 20, 2014.) Plaintiff subsequently received a Dismissal and Notice of Rights letter from the EEOC adopting PHRC's findings and notifying Plaintiff of her right to sue. (Compl., Ex. C, EEOC Dismissal and Notice

of Rights, Aug. 7, 2014.)  Plaintiff filed a Complaint in United States District Court on October

15, 2014, the contents of which are described in the following sections.

### B.  Allegations of Racial Discrimination in Plaintiff's District Court Complaint

Plaintiff alleges that she suffered adverse employment actions on the basis of her race

including the following:

> a) NHS managers including Defendants Paster and Maid "yelled undermined and otherwise belittled plaintiff in a manner that was justified only as an expression of Maid and Paster's dislike of Plaintiff's race;"
>
> b) NHS managers including Defendants Paster and Maid "gave [P]laintiff tasks that were impossible for [P]laintiff to complete with the precise objective of making [P]laintiff fail including increasing her work load and not that of her White and African comparators with unprecedented assignments that were yet another task that [D]efendants demanded [P]laintiff perform off the clock;"
>
> c) NHS managers including Defendants Paster and Maid "simply refused to pay or to release to [P]laintiff the wages that [P]laintiff had earned;"
>
> d) "NHS stated it terminating [sic] [P]laintiff's employment for unspecific and false reasons including failure to meet expectations, alleged failure to attend a group supervision and a shockingly false allegation that [P]laintiff signed in to attend a meeting.  As is the pattern and practice of the NHS BHRS Program management including [D]efendant Paster, these are pretextual lies to justify the blatant racism that employees of color experience at that workplace;"[1]
>
> e) Plaintiff's supervisors, including Defendants Paster and Maid, "refused to meet, instruct, counsel or otherwise interact with [P]laintiff and only [P]laintiff and ignored [P]laintiff's requests for instruction;"
>
> f) "These same persons routinely changed expectations and directives for [P]laintiff that were ineffectively conveyed to [P]laintiff and which made it significantly more difficult for [P]laintiff, and only [P]laintiff, unlike her White and African

---

[1] Paragraph 20(d) in the Complaint also contains a footnote which reads as follows:  "In Lora v. NHS, Civil No. 12-2357 two of plaintiff Ford-Greene's former colleagues at NHS Inc.'s BHRS program brought claims under the same laws and against the same decision makers as plaintiff does here."  (Compl. ¶ 20(d) n.1.)

> comparators who were not treated thus, to discharge the duties of her job or to grow and develop in that position;"
>
> g) Plaintiff's managers denied Plaintiff "the possibility of obtaining promotions, pay raises, fair payment for hours worked and generally to thrive in her job."

(Id. ¶¶ 20(a)–(g).)  Plaintiff asserts that her supervisors' actions "derailed" her career and "stained her reputation in a way that was completely unwarranted as the underlying circumstances of the career derailment were all pretext for racial discrimination."  (Id. ¶ 22.) Plaintiff alleges that Defendants Paster and Maid treated NHS employees who were white and African "with distinct preference" over African-American and Latino employees.  (Id. at ¶¶ 27–28.)  According to Plaintiff, it was only when Defendants Paster and Maid became her supervisors that she began to "experience detrimental actions because of her race."  (Id. ¶ 30.) For most of her career with Defendant NHS, Plaintiff's supervisors were African-American and she did not experience hostility, discrimination, or retaliation while under their supervision.  (Id. ¶ 31.)

### C.  Hostile Work Environment Allegations in Plaintiff's District Court Complaint

Plaintiff alleges that as soon as she came under the supervision of Defendants Paster and Maid, she was subjected to a racially hostile work environment "of an ongoing and continuing nature."  (Id. ¶ 33.)  Paster and Maid "routinely did not want or need to meet with her, to not properly or even adequately inform her in a supervisory setting what was it, if anything, in her professional behavior that was not up to par, all in a frequent, severe and pervasive manner" because of their "dislike of [P]laintiff's race."  (Id. ¶ 34.)  The "white management at NHS, Paster and Maid, disliked [P]laintiff's race and thus treated her differently and adversely by changing the terms and conditions of the BHRS program into a racist environment."  (Id. ¶ 36.) Paster and Maid treated Plaintiff "as if she did not belong there" and "they also ruined her career

at NHS as a result of this discriminatory conduct." (Id. ¶ 37.) Plaintiff alleges the following

events contributed to the hostile work environment she experienced:

> a. Maid, who is white, was Plaintiff's direct supervisor and "yelled at and publicly humiliated [P]laintiff on several occasions including threatening her with and in fact disciplining [P]laintiff for no reason."
> b. Paster, who is white, "and a decision maker who supervised Maid and in turn [P]laintiff, yelled at and publicly humiliated [P]laintiff on several occasions including placing [P]laintiff in a false light."
> c. During a meeting, Paster "yelled at [P]laintiff, belittled her, undermined her and threatened her with termination if [P]laintiff did not do exactly what Paster wanted about a patient/client/consumer of NHS's in [P]laintiff's care."

(Id. ¶ 40.)

### D.  Allegations of Retaliation in Plaintiff's District Court Complaint

Plaintiff asserts that she engaged in protected conduct under Title VII and the PHRA

when "she clearly noticed NHS and the individual defendants that she opposed their racist and

adverse treatment of her and that this treatment was discrimination." (Id. ¶ 41.) Plaintiff

contacted NHS Human Resources orally and in writing and stated that "Maid and Paster were

discriminating against [P]laintiff because [she] was black and Maid and Paster, who are white,

were giving Plaintiff bad reviews, bad clients, withholding her payments and otherwise

preventing her from enjoying her job and from advancing her career at NHS." (Id. ¶ 42.) After

Plaintiff complained to NHS Human Resources, "there was an actual meeting between

[P]laintiff, NHS Human Resources and Maid and Paster during which the situation actually

escalated" and Maid and Paster "actually treated [P]laintiff in a worse manner than the horrid

way they had already been using with her, as punishment and retaliation for [P]laintiff's

opposition and protected conduct." (Id. ¶ 43.) After Plaintiff "opposed NHS's and the

individual [D]efendants' racism," Plaintiff asserts that she experienced the following adverse

employment actions:

> a. Plaintiff complained of race-based discrimination and hostility in the work environment to NHS, Inc., management as early as June 2011.
> b. After her complaint, "the race-based discrimination and the hostility that [P]laintiff had endured at NHS, Inc., actually increased including adverse employment actions in the form of unwarranted discipline, uneven application of discipline, harassment and eventual termination on the same date of her last complaint to NHS, Inc.
> c. There is no other reason to explain why this increase in the hostility took place.
> d. This increase in the hostility "certainly would deter anyone from complaining about the race-based discrimination and hostility in the first place and the plaintiff would not have complained had she known this."

(Id. ¶ 44.)

After Plaintiff complained of her treatment, "NHS and the individual defendants then

retaliated against [P]laintiff when they forced on [P]laintiff the adverse actions, including

termination, which had no legitimate basis other than deterring the [P]laintiff and others from

opposing the blatant racist practices that are normal at NHS, Inc[.] and which is described in the

adverse employment averred [in the Complaint] which are incorporated as if stated here at lenght

[sic]."  (Id. ¶ 45.)  According to Plaintiff, "[t]here is no reason for defendants to created [sic] and

aided and abetted in the creation of all this adverse action against plaintiff other than her

engagement in protected conduct on or about June 2010 which was a complaint of discrimination

based on race . . . ."  (Id. ¶ 46.)  Plaintiff asserts that she was fired on February 8, 2012, because

of "her engagement in the original opposition of June through November, 2011 and the further

opposition of January, 2011 when [P]laintiff met with [D]efendant Maid on several occasions

and on each of those occasions orally informed Maid that the actions, treatment and assignments

that Maid was giving [her] were racist and discriminatory against [her] as well as unprecedented

in [P]laintiff's employment at NHS." (<u>Id.</u> ¶ 47.)  NHS terminated Plaintiff for what it calls

"failure to meet expectations." (<u>Id.</u> ¶ 48.)

### E.  <u>Alleged Violations of Wage Laws in Plaintiff's District Court Complaint</u>

Plaintiff, in her position as a Behavior Specialist, worked as an hourly full-time employee

at NHS in excess of 40 hours per week. (<u>Id.</u> ¶ 51.)  Plaintiff documented her work hours for

payroll and internal compliance through a document called a "voucher." (<u>Id.</u> ¶ 52.)  A voucher

was used to document the hours of service that employees delivered to the specific client in

accordance with the number of hours NHS authorized for each client. (<u>Id.</u>)  All "on the clock"

time for which employees were paid stemmed from these authorized vouchers. (<u>Id.</u> ¶ 53.)  The

signed vouchers were sent to the City of Philadelphia for payment to NHS for service delivered,

and then to the NHS payment system which in turn issued a direct deposit check that would

become an employee's paycheck. (<u>Id.</u> ¶ 54.)  NHS "often times prevented [P]laintiff from

receiving her paycheck after she had performed services that were or should have been

documented in a voucher." (<u>Id.</u> ¶ 55.)  NHS required Plaintiff to work, but not document the

work on vouchers, "so that she was effectively working off the clock." (<u>Id.</u> ¶ 56.)  NHS

sometimes withheld either blank or already signed vouchers, or both, from Plaintiff and would

"threaten [P]laintiff to not release these vouchers to her (or to payroll) unless [she] performed

additional off-the-clock work for which she was also not paid." (<u>Id.</u> ¶ 57.)  NHS did not

discipline "voucher" employees for "for working 'off the clock' as they attended, for example

trainings and supervisions that NHS required their attendance to but did not provide 'vouchers'

or any other form of 'on the clock' payment." (<u>Id.</u> ¶ 58.)  Plaintiff alleges the following

examples of "off the clock" work:

      a.  Answering phone calls and e-mails
      b.  Traveling to remote locations to provide services

      c.  Formatting, drafting and otherwise writing notes, progress reports, treatment plans and other documents concerning [P]laintiff's clients

      d.  Reviewing documents

      e.  Attending trainings and work-related meetings.

(Id. ¶ 61.)

Plaintiff alleges, on information and belief, that Defendant NHS did not, until recently, post Fair Labor Standards Act laws "in an area alerting [P]laintiff of her rights to payment for time worked and to overtime pay" and thus, she only recently became aware that she was owed additional compensation. (Id. ¶¶ 70–71.) Counsel for Plaintiff sent Defendant NHS a letter dated February 5, 2014, demanding back wages estimated at "$21,370.00 covering three years of unpaid for wages from the expected date of filing of Ms. Green's lawsuit against NHS." (Compl., Ex. D, Back Wages Demand Letter, Feb. 5, 2014.)

## F.  Procedural History

Plaintiff initiated the present litigation by filing the Complaint on October 15, 2014, setting forth the following seven causes of action: 1) discrimination on the basis of race, in violation of 42 U.S.C. § 2000e, *et seq.*, against Defendant NHS; 2) discrimination on the basis of race, in violation of the Pennsylvania Human Relations Act ("PHRA"), against all Defendants; 3) retaliation against Plaintiff for having engaged in protected conduct, in violation of Title VII of the Civil Rights Act of 1964, against Defendant NHS; 4) retaliation against Plaintiff for engaging in protected conduct, in violation of the PHRA, against all Defendants; 5) intentional discrimination on the basis of race, in violation of 42 U.S.C. § 1981, against Defendant NHS; 6) violations of § 7 of the Fair Labor Standards Act, 29 U.S.C. § 201, against Defendant NHS; and 7) violation of the Pennsylvania Wage Laws, including the Minimum Wage Act, 43 P.S. 333.101 and the Wage Payment and Collection Law, 43 P.S. 260.1, against Defendant NHS.  Defendants filed a joint Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6) and to Strike Paragraphs 20(d), 27, 28, 29, 30, 31, 34, and 45 of the Complaint pursuant to Federal Rule of Civil Procedure 12(f) on December 19, 2014. Plaintiff filed a Response on December 30, 2014. Defendants submitted a Reply on January 9, 2015. The Motion to Dismiss and/or to Strike is now ripe for judicial consideration.

## II.       STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.    DISCUSSION

Defendants move to dismiss Plaintiff's Complaint in its entirety pursuant to Rule 12(b)(6). Specifically, Defendants move to dismiss Counts One, Two, Three, and Four to the extent that Plaintiff is alleging a hostile work environment, failure to promote, and aiding and abetting claims, and also move to dismiss Counts Six and Seven. Additionally, Defendants move to strike Paragraphs 20(d), 27, 28, 29, 30, 31, 34, and 45 of the Complaint pursuant to Rule 12(f). Having considered the Complaint and the parties' briefs, the Court finds that Plaintiff has not sufficiently pled all or certain aspects of Counts One, Two, Three, Four, Six, and Seven, and

will grant Defendants' Motions to Dismiss all or part of those claims.  Defendants' Motion to Strike portions of the Complaint is granted only with respect to Footnote 1 to Paragraph 20(d) and the first sentence of Paragraph 30.

## A. <u>Count One</u>

Plaintiff alleges that she was subjected to adverse employment actions based on her race, including, but not limited to, failure to promote, intimidation, disenfranchisement, and termination.  (Compl. ¶ 74.)  Plaintiff believes and avers that Defendant NHS instigated, knew, or should have known of the offensive treatment of Plaintiff that created a hostile work environment.  (<u>Id.</u> ¶ 76.)  The alleged acts are in violation of 42 U.S.C. § 2000e, *et seq.*  (<u>Id.</u> ¶ 77.)

### 1. <u>Hostile Work Environment</u>

Defendant NHS moves to dismiss Plaintiff's hostile work environment claim because Plaintiff failed to exhaust her administrative remedies with respect to that claim.  (Defs.' Mem. Supp. Mot. Dismiss 10.)  Specifically, Defendant NHS argues that "in her PHRC Complaint, Plaintiff makes no mention that she was subjected to a hostile work environment nor does she plead any facts that would suggest that she suffered under the same."  (<u>Id.</u> at 12.)  According to Defendants, the allegations in Plaintiff's PHRC charge amount to claims that "NHS treated her in a disparate fashion, disciplined her inappropriately, and ultimately terminated her in retaliation for a complaint she made about same," but they "do not come close to establishing a hostile work environment."  (Defs.' Reply 3.)

A claim has been administratively exhausted when the specifics of a charge with the administrative agency "fairly encompass a claim" and would put the agency and the defendant employer "on notice" of that claim.  <u>See</u> <u>Antol v. Perry</u>, 82 F.3d 1291, 1296 (3d Cir. 1996); <u>see</u>

also Nerosa v. Storecast Merchandising Corp., No. Civ.A.02–440, 2002 WL 1998181, at *3

(E.D. Pa. Aug. 28, 2002) ("As a precondition for filing suit under Title VII, the ADEA, the ADA

and the PHRA, a plaintiff must exhaust a claim by presenting it in an administrative charge to the

EEOC and the PHRC.") (citing Antol, 82 F.3d at 1296).[2]  In the charge Plaintiff filed with

PHRC, she asserted two counts—retaliation and racial discrimination—in connection with her

termination from Defendant NHS.   Plaintiff did not include a count of hostile work environment

in her PHRC charge or the amendment that was filed two years later.  Thus, in order to allow

Plaintiff to bring a claim of hostile work environment in this matter, that claim must have been

"fairly encompassed" by her charges of retaliation and disparate treatment.

    A plaintiff alleging a hostile work environment claim "must establish that: (1) [s]he

suffered intentional discrimination because of [her] [race]; (2) the discrimination was pervasive

and regular; (3) it detrimentally affected [her]; (4) it would have detrimentally affected a

reasonable person of the same protected class in [her] position; and (5) there is a basis for

vicarious liability."  Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (citing Cardenas

v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)).  "For a hostile work environment claim to

succeed, the conduct complained of must be adverse, severe, pervasive or regular and of the kind

that would have detrimentally affected a reasonable person in like circumstances." Harley v. U.S.

Sec'y of Treasury, 444 F. App'x 594, 595 (3d Cir. 2011) (citing Huston v. Procter & Gamble

Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009)).

---

[2] "Although the PHRA does not contain an analogous [exhaustion of administrative remedies]
requirement, courts have held that the PHRA should be interpreted consistently with Title VII."
McLaughlin v. Rose Tree Media Sch. Dist., 52 F. Supp. 2d 484, 491–92 (E.D. Pa. 1999)
(citations omitted).  "To bring suit under the PHRA, a plaintiff must first have filed an
administrative complaint with the PHRC within 180 days of the alleged act of discrimination."
Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997) (citing 43 Pa. Cons. Stat. §§
959(a), 962).

In support of the retaliation charge Plaintiff filed with PHRC, Plaintiff stated that after she complained to human resources, her "work was scrutinized daily" and she "was accused of not attending meeting [sic] and not communicating with the entire team and these accusations were not true." (Compl., Ex. A ¶ 11.)  In support of her racial discrimination charge filed with PHRC, Plaintiff asserted that white employees were treated more favorably than her because (1) "they did not submit their 30 day review on time and were not disciplined nor discharged" for late submissions; (2) "[w]hen white employees attended another supervisors [sic] group meeting they were not written up;" (3) [w]hite employees were not required to write an incident report when they were not present when a student was injured;" and (4) "[w]hite employees were excused from a case while [Plaintiff] was kept on cases for longer periods of time."  (Id. ¶¶ 18–19.)

The allegations included in Plaintiff's PHRC complaint do not "fairly encompass" a hostile work environment claim because they do not include any allegations of NHS employees' behavior that is "adverse, severe, pervasive or regular."  Harley, 444 F. App'x at 595.  The United States Court of Appeals for the Third Circuit has held that "a hostile work environment claim was within the scope of an initial EEOC charge because it alleged the plaintiff was subjected to an 'abusive atmosphere,' a phrase which is interchangeable with 'hostile work environment.'"  See Barzanty v. Verizon PA, Inc., 361 F. App'x 411, 414 (3d Cir. 2010).  Plaintiff's PHRC charges, however, do not contain "analogous language" "which could give rise to a hostile work environment claim."  Id.; see also Raffaele v. Potter, No. Civ.A. 09-3622, 2012 WL 33035, at *5 (E.D. Pa. Jan. 6, 2012) ("[A] claim for hostile work environment is based on the "pervasiveness" of the employer's discriminatory conduct and is fundamentally different from a claim for disparate treatment, which focuses on discrete events.") (citing Harley, 444 F.

App'x at 595 (discussing administrative exhaustion and explaining that claims for disparate treatment and hostile work environment are separate claims, each with specific requirements)).

Plaintiff's statement in the PHRC charge that her work was "scrutinized daily" after her supervisors became aware that she engaged in protective conduct does not equate to an assertion that she was subjected to a hostile work environment. Likewise, Plaintiff's allegations that she was treated differently from white employees because they were not disciplined for violations of NHS policies or procedures and because she was kept on cases for longer periods of time are not sufficient to bring a hostile work environment claim within the scope of her PHRC complaint. Plaintiff has not, therefore, administratively exhausted her claim against Defendant NHS for a hostile work environment, and accordingly that claim must be dismissed.

In response to Defendant NHS's argument, Plaintiff quotes the factual allegations set forth in the Complaint that she filed in district court and argues that "in her federal complaint [Plaintiff] clearly argues that [her] supervisors created a hostile environment for NHS employees of color such as her (Complaint Nos. 33, 34, 36) and this is the same complaint she listed at the PHRC." (Pl.'s Resp. Opp'n 5–6.) Plaintiff's district court Complaint is not, however, the same as the charge she filed with PHRC. Plaintiff maintains that her hostile work environment claim "inherently stem[s] from the matters [she] listed in her factual statement at the PHRC," (id. at 6–7), and that she "clearly noticed defendants, in her charge at the PHRC that Maid and Paster had discriminated against her and that this discrimination took the form of creating a hostile work environment for [Plaintiff] at NHS." (Id. at 7.) Contrary to Plaintiff's assertions, Defendants would not have been on notice that the allegations in her PHRC charge would result in a federal court claim of hostile work environment. Plaintiff is simply incorrect that the allegations in the PHRC charge are the same as the more numerous and far more detailed allegations supporting

the additional claim of a hostile work environment that she included in the Complaint. Accordingly, Plaintiff's hostile work environment claim against Defendant NHS is dismissed with prejudice.

**2.  Failure to Promote**

In Count One, Plaintiff stated that Defendants' conduct resulted in Plaintiff's "failure to grow professionally" and that she was subjected to adverse employment actions including failure to promote.  (Compl. ¶ 74, 78.)  Defendants argue that to the extent Plaintiff is now seeking to bring a failure to promote claim, it must be dismissed because Plaintiff did not include failure to promote as part of her PHRC charge.  (Defs.' Reply Br. 3.)  As discussed above, Plaintiff may not bring a failure to promote claim if she did not administratively exhaust it.

A failure-to-promote claim requires Plaintiff to show "'(i) that [s]he belongs to a [protected category]; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.'"  Noel v. The Boeing Co., 622 F.3d 266, 274 (3d Cir. 2010), as amended (Oct. 18, 2010) (quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994)).

Plaintiff does not allege any facts supporting a failure to promote claim in her PHRC charge.  Accordingly her PHRC charge concerning retaliation and disparate treatment does not "fairly encompass" a failure to promote claim, and, thus, she may not now bring that claim after failing to administratively exhaust it.  In addition, the Complaint contains only general and conclusory allegations that Defendants prevented her from growing and developing in her position, that they derailed and destroyed her career, and that Plaintiff's managers denied

Plaintiff "the possibility of obtaining promotions, pay raises, fair payment for hours worked and generally to thrive in her job."  (Compl. ¶ 20(f) (emphasis added).)  Such allegations are insufficient to support a failure to promote claim even if it had been administratively exhausted. Accordingly, to the extent Plaintiff asserts a failure to promote claim as part of Count One, that claim is dismissed with prejudice.

### 3.  Intimidation

It is not clear from the factual allegations in Count One or the rest of the Complaint what Plaintiff means by the allegation that she was subjected to adverse employment actions including "intimidation."  Nonetheless, it is well-established that if a complaint is subject to Rule 12(b)(6) dismissal, a district court must ordinarily permit a curative amendment unless such an amendment would be inequitable or futile.  Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). Dismissal without leave to amend is justified only on grounds of bad faith, undue delay, prejudice, and futility.  Id. at 236.  This opportunity to amend must be offered, even if the plaintiff does not specifically make such a request.  Id. at 235.  Plaintiff's intimidation claim is, therefore, dismissed without prejudice.  To the extent Plaintiff wishes to re-assert a legally cognizable claim for the "intimidation" she experienced—one that can be supported by factual allegations and which was administratively exhausted—she may re-plead that portion of Count One.

### 4.  Disenfranchisement

It is likewise not clear from Plaintiff's Complaint what she means by her allegation that Defendant NHS's conduct caused her "disenfranchisement," and that aspect of Count One is dismissed without prejudice.  As with her intimidation claim, Plaintiff may choose to re-plead

that aspect of Count One if she can show that it is a legally cognizable claim that was administratively exhausted and is supported by sufficient factual allegations.

### 5. **Termination**

Finally, Plaintiff alleges that her termination was an adverse employment action based on race. That aspect of Plaintiff's claims in Count One was administratively exhausted, as it was specifically listed as one of the counts of Plaintiff's PHRC charge.  Defendants do not seek dismissal of that aspect of Count One, and because Plaintiff established the requisite elements of a prima facie case of discrimination in connection with her termination, the termination aspect of Plaintiff's claims in Count One may remain. [3]

In sum, because Plaintiff did not administratively exhaust her claims of hostile work environment and failure to promote, those aspects of Count One must be dismissed with prejudice.  Plaintiff's claims of intimidation and disenfranchisement are dismissed without prejudice, and Plaintiff has leave to amend her Complaint if she wishes to re-plead those aspects of Count One.  The portion of Count One which is based on Plaintiff's termination is not dismissed.

---

[3] In an employment discrimination case, claims are governed by the three step burden-shifting framework developed in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under the <u>McDonnell Douglas</u> model, the plaintiff is first required to set forth sufficient evidence to establish a *prima facie* case.  "Under that familiar test, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc)).  In this case, Plaintiff has adequately pled a *prima facie* case of discrimination in connection with her termination.

**B. Count Two—Aiding and Abetting**

Count Two asserts that Defendants Paster and Maid violated the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*, by aiding and abetting Defendant NHS in discriminating against Plaintiff.  (Id. ¶ 86.)  Plaintiff alleges that she was subjected to adverse employment actions based on her race, including, but not limited to, failure to promote, intimidation, disenfranchisement, and termination.  (Compl. ¶ 81.)  Plaintiff further alleges that Defendants Paster and Maid "aided and abetted [Defendant NHS] in the execution, implementation, enforcement and all other ways related to these racially discriminatory adverse employment actions against [P]laintiff," solely on the basis of Plaintiff's race.  (Id. ¶¶ 82–83.)  Plaintiff believes and avers that Defendant NHS instigated, knew, or should have known of the offensive treatment of Plaintiff that created a hostile work environment, and that Defendants Paster and Maid aided and abetted Defendant NHS because they instigated, knew, or should have known of the offensive treatment which created a hostile work environment.  (Id. ¶¶ 84–85.)

Defendants argue that Plaintiff's aiding and abetting claim against Paster and Maid must be dismissed because Plaintiff did not exhaust her administrative remedies as to those individuals because (1) they were not named as respondents in the original PHRC charge and (2) the claim against them for aiding and abetting was not part of the original PHRC charge.  (Defs.' Mem. Supp. Mot. Dismiss 14.)  Plaintiff responds by arguing that she "accused Paster and Maid of racial animus at the PHRC," and that "[n]aturally this animus means that Paster and Maid colluded, conspired, aided and abetted with at least each other to discriminate against [Plaintiff] because she is black and they are white."  (Pl.'s Resp. Opp'n Mot. Dismiss 4.)  According to Plaintiff, the factual statements in her PHRC charge regarding Defendants Paster and Maid "are

19

fundamentally the same allegations she has now raised in federal court against these same defendants." (Id. at 5.)

To the extent that Count Two alleges that Defendants Paster and Maid aided and abetted Defendant NHS in creating a hostile work environment and in failing to promote Plaintiff, those claims are dismissed with prejudice. As discussed above, Plaintiff may not bring failure to promote or hostile work environment claims against Defendant NHS because she did not administratively exhaust those claims. In the absence of such claims against Defendant NHS, Plaintiff may not bring failure to promote or hostile work environment claims against the individual defendants. See Deans v. Kennedy House, Inc., 998 F. Supp. 2d 393, 414 n.20 (E.D. Pa.), aff'd, 587 F. App'x 731 (3d Cir. 2014) ("Although the PHRA permits claims against individuals for aiding or abetting an unlawful discriminatory practice . . . individual employees cannot be held liable if the employer is not liable for a discriminatory practice.") (citing Scott v. Sunoco Logistics Partners, LP, 918 F. Supp. 2d 344, 357 n.5 (E.D. Pa. 2013) ("If the employer is not liable for any discriminatory practice then an individual employee cannot be held liable for aiding and abetting a discriminatory practice.")).

Similarly, Plaintiff has not adequately alleged intimidation or disenfranchisement against Defendant NHS, and thus those aspects of the aiding and abetting claims against the individual defendants are also dismissed without prejudice. If Plaintiff amends her Complaint properly to re-plead those aspects of her claims in Count One, then she may also amend her Complaint properly to re-plead those aspects of her claims in Count Two.

As the termination aspect of Plaintiff's claims against Defendant NHS in Count One remains, she is not barred from bringing an aiding and abetting claim against the individual defendants on that basis. Defendants argue, however, that because Paster and Maid were not

named as respondents in the original PHRC complaint, and because PHRC did not serve them with Plaintiff's PHRC complaint, she cannot now bring aiding and abetting claims against them. (Defs.' Mem. Supp. Mot. Dismiss 15.)

"A Title VII action ordinarily may be brought only against a party previously named in an EEOC action."[4]  Schafer v. Bd. of Pub. Educ. of the Sch. Dist. of Pittsburgh, Pa., 903 F.2d 243, 251 (3d Cir. 1990) (citing 42 U.S.C. § 2000e-5(f)(1)).  Nonetheless, the Third Circuit "recognizes an exception when the unnamed party received notice and when there is a shared commonality of interest with the named party."  Id. at 252 (citing Glus v. G.C. Murphy Co., 629 F.2d 248, 251 (3d Cir.1980), vacated on other grounds, 451 U.S. 935 (1981)).[5]

---

[4]  As previously stated, "[a]lthough the PHRA does not contain an analogous requirement, courts have held that the PHRA should be interpreted consistently with Title VII."  McLaughlin v. Rose Tree Media Sch. Dist., 1 F. Supp. 2d 476, 481–82 (E.D. Pa. 1998) (citations omitted).

[5] The Third Circuit determined that four factors should be considered when determining whether to apply the Glus exception: "1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar [to] the unnamed party that for purposes of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party."  Schafer, 903 F.2d at 252 & n.7 (citing Glus, 629 F.2d at 251).  The Third Circuit stated that its "four-prong test is not a mechanical one; no single factor is decisive.  Instead each factor should be evaluated in light of the statutory purposes of Title VII and the interests of both parties."  Glus, 629 F.2d at 251.  "More recently, the Third Circuit has streamlined this inquiry to a two factor test—where the unnamed party has received notice and where there is a shared commonality of interest between the named and the unnamed parties[—]failure to name a defendant in an EEOC charge does not divest a federal court of jurisdiction."  Roche v. Supervalu, Inc., No. Civ.A.97-2753, 1998 WL 437265, at *1 (E.D. Pa. July 29, 1998) (citing Schafer, 903 F.2d 243 (recognizing an exception when the unnamed party received notice and when there is a shared commonality of interest with the named party) (additional citations omitted)).

In applying <u>Glus</u>, several courts in this district have determined that "where a defendant is not named as a defendant in the caption of the administrative proceeding, but is named in the body of the complaint, that defendant has sufficient notice to satisfy the general rule." <u>McLaughlin</u>, 1. F. Supp. 2d 476, 482 (E.D. Pa. 1998) (citing <u>Glickstein v. Neshaminy Sch. Dist.</u>, No. Civ.A.96-6236, 1997 WL 660636, at *11 (E.D. Pa. Oct. 22, 1997); <u>Timmons v. Lutheran Children & Family Serv. of E. Pa.</u>, No. Civ.A.93-4201, 1993 WL 533399, at *4 (E.D. Pa. Dec. 17, 1993). Notably, "[t]he Third Circuit has found that Title VII must be construed liberally to prevent its jurisdictional requirements from thwarting the statute's substantive policies." <u>Glickstein</u>, 1997 WL 660636, at *10 (citing <u>Glus</u>, 562 F.2d at 887–888). "Particularly where a complainant files her administrative complaint pro se, she should not be expected to anticipate the legal significance that might be attached to whether particular individuals are named as respondents or merely named in the body of the complaint." <u>Id.</u> (additional citations omitted). "Therefore, courts relax Title VII's jurisdictional requirements—and necessarily the PHRA's as well—where a plaintiff has named the subsequent defendants in the body of the administrative charge." <u>Id.</u>

In this case, Defendants Paster and Maid were both named in the body of Plaintiff's original PHRC charge with sufficient detail such that they would have had notice of Plaintiff's allegations that she was terminated in a discriminatory manner in part because of their conduct, even though they were not initially named as respondents. As to the second factor, it is debatable whether there is shared commonality of interest between Defendant NHS and Defendants Paster and Maid such that the factors of the <u>Schafer</u>/<u>Glus</u> test are satisfied. For jurisdictional purposes, however, it does not matter because Plaintiff subsequently amended her

PHRC charge to include Defendants Paster and Maid as respondents.[6]  While Defendants have argued that Paster and Maid were not served with Plaintiff's original PHRC complaint, according to the Amended Certificate of Service, both Paster and Maid were served with copies of the Amended Complaint by first class mail on April 17, 2014.  (Defs.' Mem. Supp. Mot. Dismiss, Ex. 1, Certificate of Service.)  Thus, in the absence of contrary evidence, it may be presumed that Defendants Paster and Maid received notice of Plaintiff's termination allegations against them and the fact that they were named as respondents in Plaintiff's administrative charges as of the date of the Amended Complaint.[7]  Accordingly, Plaintiff's aiding and abetting claim for termination need not be dismissed for failure to name Defendants Paster and Maid as respondents in the initial PHRC charge.

Defendants next argue that "aiding and abetting" discrimination "is a separate cause of action that was not contained in the original PHRC Complaint filed by Plaintiff" and that the

---

[6] Defendants argue that Plaintiff's amendment came more than 180 days after the relevant events occurred and is thus invalid.  (Defs.' Mem. Supp. Mot. Dismiss 15.)  With respect to Plaintiff's amended PHRC charge, the PHRA states that during the hearing phase "[t]he Commission or the complainant shall have the power reasonably and fairly to amend any complaint, and the respondent shall have like power to amend his answer."  43 Pa. Con. Stat. § 959(e).  Charges with the EEOC may also be amended "to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein.  Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received."  29 C.F.R. § 1601.12.  While the wording of the amendment provisions in the PHRA and the Code of Federal Regulations provisions pertaining to the EEOC are different, Plaintiff's amendment adding Paster and Maid as respondents relates back to the filing date of her original PHRC charge.  See McLaughlin v. Rose Tree Media Sch. Dist., 1 F. Supp. 2d 476, 481–82 (E.D. Pa. 1998) ("courts have held that the PHRA should be interpreted consistently with Title VII.")  (citations omitted).

[7] Defendants argue that the amended complaint is a nullity because it wasn't verified by the plaintiff.  (Defs.' Mem. Supp. Mot. Dismiss 15.)  EEOC regulations provide that "[a] charge shall be in writing and signed and shall be verified."  29 C.F.R. § 1601.9.  It would appear, however, that both the EEOC and PHRC accepted and served Plaintiff's amended charge adding Defendants Paster and Maid as respondents.  Substantively, the factual allegations did not change, only the caption.  Thus, in light of the circumstances, the fact that Plaintiff did not sign or verify the amended charge need not deprive this Court of jurisdiction.

23

claims against Defendants Paster and Maid must therefore be dismissed.  (Defs.' Mem. Supp.
Mot. Dismiss 15.)  The Court disagrees.

As discussed above, a claim has been administratively exhausted when the specifics of a
charge with the administrative agency "fairly encompass a claim" and would put the agency and
the defendant employer "on notice" of that claim.  See Antol v. Perry, 82 F.3d 1291, 1296 (3d
Cir. 1996).  The administrative exhaustion requirement, however, "is tempered by a fairly liberal
construction given to EEOC charges."  Schouten v. CSX Transp., Inc., 58 F. Supp. 2d 614, 616
(E.D. Pa. 1999).  Generally, a Title VII plaintiff cannot bring claims in a civil lawsuit that were
not first included in an EEOC charge and exhausted at the administrative level.  Burgh v.
Borough Counsel of Montrose, 251 F.3d 465, 469–70 (3d Cir. 2000).  "The most important
consideration in determining whether the plaintiff's judicial complaint is reasonably related to
his EEOC charge is the factual statement."  Id. at 197.  Thus, "if the allegations made in the
complaint filed in this Court could be 'reasonably expected to grow out of' those contained . . .
in the EEOC charge, the pleading of the plaintiff will withstand a motion to dismiss, as the
administrative remedies available to plaintiff will have been exhausted."  Schouten, 58 F. Supp.
2d at 616 (quoting Page v. ECC Mgmt. Servs., No. Civ.A.97-2654, 1997 WL 762789, at *3
(E.D. Pa. Dec. 8, 1997)) (further quotations omitted).  Stated differently, where a plaintiff
attempts to assert a claim at the district court level which was not raised in the administrative
charge, the claim is considered exhausted if it is "fairly within the scope of the prior EEOC
complaint, or the investigation arising therefrom."  Antol, 82 F.3d at 1295 (quoting Waiters v.
Parsons, 729 F.2d 233, 237 (3d Cir. 1994), as amended (March 2, 1984)).  A reasonable EEOC
investigation should include claims not specifically mentioned in the EEOC charge "where there
was a close nexus between the facts supporting the claims raised in the charge and those in the

24

complaint."  Pourkay v. City of Phila., No. Civ.A.06-5539, 2009 WL 1795814, at *5 (E.D. Pa.

June 23, 2009) (citing Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir.

1984)).  "In such a case, the Court may reasonably expect an awareness on the part of the

defendant that such allegations are likely."  Schouten, 58 F. Supp. 2d at 616–17.

In her PHRC charge, Plaintiff alleged that she was terminated because of her race, and

specifically named Defendants Paster and Maid in the factual allegations of her PHRC charge

regarding retaliation.  The question is thus whether Plaintiff's aiding and abetting claim against

Defendants Paster and Maid in connection with her termination was fairly encompassed in the

PHRC charge related to her termination.

The Pennsylvania Human Relations Act provides that it is an unlawful discriminatory

practice "for any person, employer, employment agency, labor organization or employee, to aid,

abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful

discriminatory practice, or to obstruct or prevent any person from complying with the provisions

of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act

declared by this section to be an unlawful discriminatory practice."  43 Pa. Con. Stat. § 955(e).

It is an unlawful discriminatory practice to, on the basis of race, "otherwise discriminate" against

an individual "with respect to compensation, hire, tenure, terms, conditions or privileges of

employment or contract."  43 Pa. Con. Stat. § 955(a).

Count Two of Plaintiff's PHRC charge alleged that she was discharged on the basis of

racial discrimination, and stated the following:

> [NHS's] reason for the action taken was that I did not attend a
> meeting and I was late submitting a treatment plan.  White
> employees were treated more favorably they did not submit their
> 30 day review on time and were not disciplined nor discharged.
> When white employees attended another supervisors [sic] group
> meeting they were not written up.  White employees were not

> required to write an incident report when they were not present
> when a student was injured.  White employees were excused from
> a case while I was kept on cases for longer periods of time.

(Compl., Ex. A, ¶¶ 18–19.)  Although Plaintiff did not identify Defendants Paster and Maid by name in the paragraphs asserting her charge of unlawful termination on the basis of race, she did identify them by name in the preceding paragraphs related to her charge of retaliation.  The adverse actions that Plaintiff described in the paragraphs specifically related to her termination charge could permit an inference that Plaintiff meant to refer to her supervisors, Paster and Maid, in describing those actions.  Moreover, Plaintiff added Paster and Maid as respondents in her amended charge with the PHRC.  "The purpose of the exhaustion requirement is satisfied as long as 'the EEOC had cognizance of the full scope of the situation during its settlement efforts.'" Lowenstein v. Catholic Health E., 820 F. Supp. 2d 639, 645 (E.D. Pa. 2011) (quoting Anjelino v. New York Times Co., 200 F.3d 73, 94 (3d Cir. 1999)).  In this case, PHRC would have been aware that Plaintiff believed Defendants Paster and Maid played a role in her retaliation claim, and could have surmised that the supervisors' conduct that Plaintiff described in her termination charge included conduct by Paster and Maid.  Thus, an aiding and abetting claim against Defendants Paster and Maid in connection with Plaintiff's termination claim is fairly encompassed by her PHRC charge, and Plaintiff's claim need not be dismissed for failure to exhaust her administrative remedies.

In sum, Defendants' Motion to Dismiss Count Two is granted in part and denied in part. The aspects of Plaintiff's aiding and abetting claim in Count Two that relate to hostile work environment and failure to promote are dismissed with prejudice; the aspects of Plaintiff's claim in Count Two that relate to intimidation and disenfranchisement are dismissed without prejudice

with leave to amend; and the aspect of Plaintiff's claim that relates to her claim of a

discriminatory termination based on race is not dismissed.

### C. **Count Three**

In Count Three, Plaintiff alleges that Defendant NHS retaliated against her and subjected

her to adverse employment actions because she engaged in protected activity by complaining

about and opposing Defendant NHS's unlawful employment practices.  (Compl. ¶ 89.)

Defendant NHS moves to dismiss Count Three to the extent that Plaintiff alleges a failure

to promote claim in addition to a claim of retaliation for engaging in protected conduct.  (Defs.'

Mot. Dismiss, WHEREFORE Clause.)  As discussed above, to the extent Plaintiff is

incorporating a failure to promote claim into Count Three, such a claim was not administratively

exhausted.  Plaintiff may not, therefore, proceed with that aspect of Count Three and Defendant

NHS's Motion to Dismiss is granted as to any failure to promote claim.  Plaintiff may, however,

proceed with her retaliation claim against Defendant NHS on the basis of her allegations that she

suffered adverse employment actions after engaging in protected conduct.  See, e.g., Harley v.

U.S. Sec'y of Treasury, 444 F. App'x 594, 596 (3d Cir. 2011) (stating that a plaintiff has

established a *prima facie* case for retaliation when: "(1) plaintiff engaged in an activity protected

by Title VII; (2) the employer took an adverse employment action against [her]; and (3) there

was a causal connection between [her] participation in the protected activity and the adverse

employment action.") (quoting Moore v. City of Phila., 461 F.3d 331, 341–42 (3d Cir. 2006)).

### **Count Four**

Plaintiff alleges in Count Four that Defendants Paster and Maid aided and abetted

Defendant NHS in its retaliatory conduct against her after she engaged in conduct that is

protected by the Pennsylvania Human Relations Act.  (Id. ¶ 93.)

As they did in connection with Count Two, Defendants argue that because Paster and Maid were not named as respondents in the original PHRC charge, and because PHRC did not serve them with Plaintiff's charge, she cannot now bring aiding and abetting claims against them in connection with her retaliation claim.  (Defs.' Mem. Supp. Mot. Dismiss 15.)  Plaintiff argues that she "accused Paster and Maid of racial animus at the PHRC," and that "[n]aturally this animus means that Paster and Maid colluded, conspired, aided and abetted with at least each other to discriminate against [Plaintiff] . . . ."  (Pl.'s Resp. Opp'n Mot. Dismiss 4.)  According to Plaintiff, the factual statements regarding conduct by Paster and Maid in her PHRC charge "are fundamentally the same allegations she has now raised in federal court against these same defendants."  (Id. at 5.)

As discussed above, Defendants Paster and Maid had notice of Plaintiff's PHRC charge of retaliation at least as of the date PHRC served them with the amended charge.  Defendants Paster and Maid were specifically named in the portion of Plaintiff's PHRC charge alleging retaliation, and thus the aiding and abetting claim that she now brings against them was fairly encompassed within the retaliation claim against Defendant NHS in her PHRC charge.  Accordingly, Defendants' Motion to Dismiss Count Four is denied.

### D.  Count Six

Plaintiff alleges that Defendant NHS violated Section 7 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201, *et seq.*, by failing to pay Plaintiff her regularly hourly rate for all hours worked up to and including forty hours, and for failing to pay Plaintiff at a rate of time and a half for all hours worked beyond forty hours.  (Compl. ¶ 100.)  Plaintiff further alleges that pursuant to 29 U.S.C. §§ 207 and 216, Defendant NHS owes Plaintiff compensation for overtime work, an additional equal amount as liquidated damages for double back pay, and attorney's fees and

28

costs.  (Id. ¶ 101.)  Plaintiff asserts that she is a worker under the meaning of the Fair Labor

Standards Act and that she previously presented demands to Defendant NHS for her past unpaid

overtime wages.  (Id. ¶ 102.)

Defendant NHS argues that Plaintiff's FLSA claim must be dismissed because she does

not allege that she was paid less than the minimum wage and because she does not allege with

specificity that she worked in excess of forty hours in any week, thereby entitling her to overtime

pay.  (Defs.' Mem. Supp. Mot. Dismiss 17.)  Defendant NHS also argues that Plaintiff's FLSA

claim must be dismissed because she did not set forth an approximation of the hours for which

she was allegedly not compensated.  (Id. at 19.)

Under FLSA, employers may not employ an employee "for a workweek longer than forty

hours unless such employee receives compensation for his employment in excess of the hours

above specified at a rate not less than one and one-half times the regular rate at which he is

employed."  29 U.S.C. § 207(a)(1).  The Third Circuit has adopted a "middle-ground approach"

regarding the requirements for a plausible FLSA overtime claim, where "'a plaintiff must

sufficiently allege [forty] hours of work in a given workweek as well as some uncompensated

time in excess of the [forty] hours.'"  Davis v. Abington Mem'l Hosp., 765 F.3d 236, 241–42 (3d

Cir. 2014) (quoting Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 114 (2d

Cir. 2013) (emphases added)).  The Third Circuit "[did] not hold that a plaintiff must identify the

exact dates and times that she worked overtime.  For instance, a plaintiff's claim that she

'typically' worked forty hours per week, worked extra hours during such a forty-hour week, and

was not compensated for extra hours beyond forty hours he or she worked during one or more of

those forty-hour weeks, would suffice."  Id. at 243 (emphasis in original).  But, the Third Circuit

also noted that it read Lundy "to hold that a plaintiff must connect the dots between bare

allegations of a 'typical' forty-hour workweek and bare allegations of work completed outside of regularly scheduled shifts, so that the allegations concerning a typical forty-hour week include an assertion that the employee worked additional hours during such a week."  Id. at 243 n.7.

In this case, Plaintiff alleged that (1) she worked as an hourly full-time employee at NHS in excess of 40 hours per week, and (2) Defendant NHS required her to work "off the clock" but without documenting that work on vouchers that are used "to document the hours of service that employees delivered to the specific client in accordance with the number of hours NHS authorized for each client" and which were used to generate employees' paychecks.  (Compl. ¶¶ 51–54, 56.)  As discussed above, Plaintiff alleged that she performed the following types of "off the clock" work:

>  a. Answering phone calls and e-mails
>  b. Traveling to remote locations to provide services
>  c. Formatting, drafting and otherwise writing notes, progress reports, treatment plans and other documents concerning [P]laintiff's clients
>  d. Reviewing documents
>  e. Attending trainings and work-related meetings.

(Id. ¶ 61.)

Defendant NHS argues that Plaintiff's FLSA claim is fatally deficient because she does not allege that the "off the clock" work took place during a week in which she worked in excess of forty hours total for that week.  (Defs.' Mem. Supp. Mot. Dismiss 18.)  The Court agrees. Like the plaintiffs in Davis, Plaintiff has not alleged that she worked extra "off the clock" hours in a particular week where she had already worked forty hours prior to undertaking "off the clock" work.  Rather, she alleges that she was not compensated for non-voucher work, which may or may not have been work that caused her work week to exceed forty hours.  See Davis, 765 F.3d at 243 ("None of the named plaintiffs has alleged a single workweek in which he or she worked at least forty hours and also worked uncompensated time in excess of forty hours.").

Moreover, Plaintiff has not alleged an approximation of the hours for which she was not compensated—she alleges only generally that she worked more than forty hours per week.[8]  In sum, in the absence of any specific allegations about given weeks where Plaintiff's work exceeded forty hours, she has not stated a plausible FLSA overtime claim.  Thus, the overtime portion of her claims in Count Six must be dismissed.

Plaintiff has also not sufficiently stated a "gap time" claim for the time she alleges was worked "off the clock."  She does not provide any details about her hourly rate or other salary terms that would enable the Court to determine whether, "by failing to pay Plaintiff her regularly hourly rate for all hours worked up to and including forty hours," (Compl. ¶ 100), she had "uncompensated hours worked that fall between the minimum wage and the overtime provisions of the FLSA, otherwise known as 'gap time.'"  Davis, 765 F.3d at 243 (internal quotation marks and citations omitted).  "'[G]ap time' is non-overtime hours worked for which an employee is not compensated."  Id. at 244.  "[But where] an employee has a sufficiently high hourly rate, when all compensated and non-compensated hours are divided into the weekly pay, the employee's average hourly pay still exceeds the FLSA minimum," "[c]ourts widely agree that there is no cause of action under the FLSA for 'pure' gap time wages—that is, wages for unpaid work during pay periods without overtime."  Id.

Plaintiff argues that the approximation of back wages contained in the letter that her counsel sent to Defendant's counsel is "a very clear demand for the number of hours owed."

---

[8] Plaintiff incorrectly argues that her allegations exceed the Third Circuit's pleading standard for FLSA overtime claims, apparently ignoring the Third Circuit's decision in Davis, which was cited in Defendants' Memorandum of Law, and relying instead on a 2012 district court case which predates the Third Circuit's decision in Davis.  (See Pl.'s Resp. Opp'n Mot. Dismiss 8 (citing Scott v. Bimbo Bakeries, USA, Inc., No. Civ.A. 10-3154, 2012 WL 645905, at *2 (E.D. Pa. Feb. 29, 2012) (observing that, at that time, the Third Circuit had "not addressed how precisely a plaintiff must plead the third element of an FLSA claim," and noting that courts are split on the issue)).)

(Pl.'s Resp. Opp'n Mot. Dismiss 8.)  That letter, however, states only that Plaintiff's demand is for what Plaintiff "in good faith, reasonably and realistically estimate[s] at $21,370.00 covering three years of unpaid for wages from the expected date of filing of Ms. Green's lawsuit against NHS."  (Compl., Ex. D, Back Wages Demand Letter, Feb. 5, 2014.)  The dollar amount sought does not shed light on the hours worked, or the hourly rate at which they were to have been paid, such that the Court could determine whether the pay she received pursuant to the vouchers was enough to make her average hourly pay higher than the FLSA minimum.  Plaintiff argues that her "averments even include how NHS would withhold wages from [Plaintiff]" through the voucher system, (Pl.'s Resp. Opp'n Mot. Dismiss 8), but Plaintiff's allegations about abuse or misuse of the voucher system are not substitutes for allegations regarding her hourly rate and hours worked.  Accordingly, in the absence of any allegations regarding Plaintiff's hourly wage or salary structure,[9] the portion of Plaintiff's FLSA claim in Count Six that constitutes a gap time claim must also be dismissed.

In light of the above discussion, Defendants' Motion to Dismiss Count Six must be granted, and Plaintiff's FLSA claims for unpaid overtime and gap time pay are dismissed without prejudice to her right to amend this claim.

### E.  Count Seven

Finally, in Count Seven Plaintiff asserts violations of the Pennsylvania Wage Laws, including the Minimum Wage Act, 43 P.S. 333.101 *et seq.* ("PAMWA"), and the Wage Payment and Collections Law, 43 Pa. C.S. 260.1, *et seq.* ("WPCL"), against Defendant NHS.  Plaintiff

---

[9] Defendant NHS notes that because Plaintiff was a "Fee for Services" Mobile Therapist, she would "rarely, if ever, have worked close to forty hours in a week on account of the nature of her position."  (Defs.' Reply Br. 6.)  As stated above, Plaintiff did not include facts or exhibits regarding the terms of her compensation or actual hours worked in the Complaint, and thus her claims are being dismissed on that basis.

maintains that Defendant NHS failed to pay her a regular hourly rate for hours worked up to forty hours, and failed to pay her overtime for hours worked over forty hours, in violation of the PAMWA.  (Compl. ¶ 105.)  Plaintiff asserts that Defendant NHS further violated the PAMWA by failing to pay Plaintiff her regular hourly rate "for all time spent working off the clock, during compensable breaks, traveling to job locations and answering telephone calls, e-mails and texts while off the clock, as well as attending trainings, supervisions and other work-related functions 'off the clock.'"  (Id. ¶ 106.)  In addition, Plaintiff alleges that Defendant NHS violated the WPCL by failing to timely pay Plaintiff's wages.  (Id. ¶ 108.)  Plaintiff seeks to recover the amount of her unpaid wages and overtime, together with liquidated damages, interest, and attorney's fees and costs.  (Id. ¶ 109.)

## 1.  Plaintiff's PAMWA Claim[10]

Similar to the wording in the minimum wage standard set forth in the FLSA guidelines, the PAMWA states that "Every employer shall pay to each of his or her employees wages for all hours worked at a rate of not less than . . . [s]even dollars fifteen cents ($7.15) an hour beginning July 1, 2007." 43 Pa. Con. Stat. § 333.104(a)(8).[11]  Various PAMWA provisions make specific reference to the FLSA and the fact that it should be read consistently with that statute.  See, e.g., 43 Pa. Con. Stat. § 333.104.  "The FLSA and the PMWA, both of which pursue the common

_____

[10] While both parties discussed Plaintiff's PAMWA claim in conjunction with her FLSA claim, it will be briefly discussed here as Plaintiff included that claim in Count Seven with her other state law wage claim, rather than in Count Six with her FLSA claim.

[11] The dollar amounts required under the PAMWA are intended to vary in accordance with the wages set in the FLSA.  See 43 Pa. Con. Stat. § 333.104 (a.1) ("If the minimum wage set forth in the Fair Labor Standards Act of 1938 (52 Stat. 1060, 29 U.S.C. § 201 et seq.) is increased above the minimum wage required under this section, the minimum wage required under this section shall be increased by the same amounts and effective the same date as the increases under the Fair Labor Standards Act, and the provisions of subsection (a) are suspended to the extent they differ from those set forth under the Fair Labor Standards Act.").

objective of protecting hourly employees from substandard and unfair wages, define minimum wage in terms of an hourly rate." Masterson v. Fed. Exp. Corp., No. Civ.A.07-2241, 2008 WL 5189342, at *3 (M.D. Pa. Dec. 10, 2008). "Pennsylvania courts have indicated that it is proper to give deference to the federal courts' interpretation of a federal statute when the state statute at issue substantially parallels the federal law." Id. Accordingly, for the same reasons discussed above concerning the dismissal of Plaintiff's overtime and gap time FLSA claims, Plaintiff's PAMWA claim must also be dismissed without prejudice.

### 2. **Plaintiff's WPCL Claim**

As stated above, Plaintiff alleges that Defendant NHS violated the WPCL by failing to timely pay her wages. (Compl. ¶ 108.) Defendant NHS argues that Plaintiff's WPCL claim fails because she has not alleged the existence of a contractual right to wages. (Defs.' Mem. Supp. Mot. Dismiss 22.)

"The purpose of the WPCL is to allow employees to recover wages and other benefits that are due from employers pursuant to agreements between the parties." Killian v. McCulloch, 850 F. Supp. 1239, 1255 (E.D. Pa. 1994). The Pennsylvania Supreme Court has stated that the WPCL provides a means of recovering wages that are due pursuant to a contract. See Oberneder v. Link Computer Corp., 696 A.2d 148, 150 (Pa. 1997) ("The Wage Payment and Collection Law provides employees a statutory remedy to recover wages and other benefits that are contractually due to them.") (citing Killian, 850 F. Supp. at 1255). Importantly, the "WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990) (internal citations omitted). In other words, "[t]o present a wage-

payment claim, the employee must aver a contractual entitlement to compensation from wages

and a failure to pay that compensation." Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 954 (Pa.

Super. 2011) (internal quotations and citations omitted) aff'd, 106 A.3d 656 (Pa. 2014).

Plaintiff argues that she is "entitled to the presumption that there is a collective

bargaining agreement that includes her, an employee paid by the hour, for, as pled in her

complaint and even admitted by defendants, she is 'a former Mobile Therapist who worked for

NHS." (Pl.'s Resp. Opp'n Mot. Dismiss 9 (quoting Defs.' Mem. Supp. Mot. Dismiss 4).)

Plaintiff relies on an excerpt of a collective bargaining agreement ("CBA") that took effect July

1, 2012, and appears to only cover "all full-time House Manager Aides" and "regular part-time

House Manager Aides," and which excludes "all supervisors, confidential Employees and

temporary Employees." (Pl.'s Resp. Opp'n Mot. Dismiss, Ex. A., CBA between NHS Human

Services, Inc.-AVS (SFR) and National Union of Hospital and Health Care Employees, Article

I.) Defendant NHS notes that AVS is a separate entity that operates group homes in

Pennsylvania, and that AVS is not alleged to have been Plaintiff's employer and that AVS does

not perform behavioral health services. (Defs.' Reply Br. 7.)

As stated previously, Plaintiff was terminated from her employment with NHS on

February 8, 2012. (Compl. ¶18.) Thus, even if Plaintiff's job position was of a category

described in the CBA excerpt—which it appears it is not—that agreement took effect after

Plaintiff was terminated, and thus would not apply to her. Setting aside the fact that Plaintiff did

not include any allegations regarding the CBA in her complaint,[12] there is nothing before the

Court to show that Plaintiff was, at the time of her employment, party to a CBA that covered her

---

[12] Plaintiff states that the CBA was "mentioned" in her Complaint, but neither Defendants nor
this Court were able to locate any such reference. (See Pl.'s Resp. Opp'n Mot. Dismiss 9; Defs.'
Reply Br. 6.)

job position.  Plaintiff has not alleged any other facts about the existence of, or terms of, a

contract with Defendant NHS.  Accordingly, Plaintiff has not pled a contractual right to wages

that would be recoverable pursuant to the WPCL.

In support of her WPCL claim, Plaintiff argues that "the complaint clearly pleads the

terms of the agreement for wages that NHS violated and which affords [her] protection under the

[WPCL]," directing the Court's attention to Paragraph 107 of her Complaint.  (Pl.'s Resp. Opp'n

Mot. Dismiss 10.)  Paragraph 107, however, merely quotes statutory language from the WPCL—

it does not make any reference to any agreement that Plaintiff allegedly had with Defendant NHS

regarding wages.[13]  Plaintiff's argument is unavailing.

Plaintiff next argues that "[e]ven absent the evidence" of a CBA, "at this stage [Plaintiff]

is simply entitled to the presumption that her averments—that the terms of a contract were

violated (Complaint at 107)—and the reasonable inferences from them—such as the fact that

there is a contract in the form of a [CBA]—are true."  (Pl.'s Resp. Opp'n Mot. Dismiss 10.)

Plaintiff's argument is not persuasive, since, as stated above, Paragraph 107 of the Complaint

contains no such averments, and it is unclear how any inferences, reasonable or otherwise, can be

made.  Plaintiff also argues that "she is entitled to the presumption that Exhibit A is a true and

correct copy of the most recent agreement and that it must be considered the terms that were in

force at the time she was not paid for work."  (Id.)  Even if Plaintiff's argument were consistent

with standards of pleading and evidence, the CBA does not appear to apply to the category of

---

[13] Plaintiff's counsel inappropriately accuses Defendants' counsel of an "absolute lack of candor for [telling] this court, in that context, that a whole count of [Plaintiff's] complaint should be dismissed" and that Defendants' arguments amount to misrepresentations to this Court.  Given the inadequacies of Plaintiff's pleadings, Defendants' arguments for dismissal are not misrepresentations, nor do they reflect a lack of candor.

employees of which Plaintiff was a member, or even to the entity that employed her, and accordingly it does not support her WPCL claim.

In sum, and in light of the foregoing, Plaintiff's PAMWA and WPCL claims are dismissed without prejudice.

**F.   <u>Motion to Strike</u>**

The final portion of Defendants' Motion seeks to strike multiple allegations from the Complaint which Defendants characterize as "completely immaterial to this matter," and which Defendants also characterize as "blatantly untrue," as well as "completely immaterial and impertinent to this matter."  (Defs.' Mem. Supp. Mot. to Dismiss 23, 24.)  Specifically, Defendants ask the Court to strike all allegations of and references to "the Palma matter and/or [that] NHS engaged in a pattern and practice or 'ample history of' discrimination."[14]

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Content is immaterial when it "has no essential or important relationship to the claim for relief."  <u>Donnelly v. Commonwealth Fin. Sys.</u>, No. Civ.A.07-1881, 2008 WL 762085, at *4 (M.D. Pa. March 20, 2008) (citing <u>Delaware Healthcare, Inc. v. MCD Holding Co.</u>, 893 F. Supp. 1279, 1291–92 (D. Del.1995)).  Content is impertinent when it does not pertain to the issues raised in the complaint.  <u>Id.</u> (citing <u>Cech v. Crescent Hills Coal Co.</u>, No. Civ.A.96-2185, at *28 (W.D. Pa. July 25, 2002)).  Scandalous material "improperly casts a derogatory light on someone, most typically on a party to the action."  <u>Id.</u> (citing <u>Carone v. Whalen</u>, 121 F.R.D. 231, 233 (M.D. Pa. 1988)).

---

[14] Defendants refer to the "Palma" matter in their Motion to Dismiss and/or to Strike, but it appears that only the Lora matter is specifically mentioned in Plaintiff's Complaint.  To the extent the "Palma" matter reference is in regard to one of the other plaintiffs in <u>Lora v. NHS, Inc.</u>, such references would also be stricken.

"The standard for striking a complaint or a portion of it is strict, and 'only allegations that are so unrelated to the plaintiffs' claims as to be unworthy of any consideration should be stricken.'" Steak Umm Co., LLC v. Steak'Em Up, Inc., No. Civ.A.09-2857, 2009 WL 3540786, at *2 (E.D. Pa. Oct. 29, 2009) (citing Johnson v. Anhorn, 334 F. Supp. 2d 802, 809 (E.D. Pa. 2004)).  "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." McInerney v. Moyer Lumber and Hardware, Inc., 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002).  Although "[a] court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)," such motions are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." River Road Dev. Corp. v. Carlson Corp., No. Civ.A.89-7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990).  To prevail, the moving party must demonstrate that "the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or [that] the allegations confuse the issues." Id. (citing 5C C. Wright & A. Miller, Federal Practice and Procedure, § 1382, at 809–10, 815 (1969)).  Motions to strike are to be decided "on the basis of the pleadings alone." North Penn Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 159 (E.D. Pa. 1994) (citations omitted).  Striking a pleading or a portion of a pleading "is a drastic remedy to be resorted to only when required for the purposes of justice." DeLa Cruz v. Piccari Press, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (quotations omitted).

Defendants' Motion requests that the Court strike (1) references to other cases that have been brought against Defendant NHS and (2) allegations that there is a pattern and practice of discrimination at NHS.  (Defs.' Mem. Supp. Mot. Dismiss 23, 25.)  Specifically, Defendants

move to strike Paragraphs 20(d), 27–31, 34, and 45 of the Complaint. (Id.)  The allegations

Defendants seek to strike from the Complaint are as follows:

- As is the pattern and practice of the NHS BHRS Program management including [D]efendant Paster, these are pretextual lies to justify the blatant racism that employees of color experience at that workplace.[15]  (Compl. ¶ 20(d).)

- Plaintiff's race was a determinative factor in the adverse actions she suffered while under Paster and Maid's supervision.  Paster and Maid, who are white, treated [P]laintiff and her peers—African-American and Latino NHS employees—with distinct racist animus.  (Id. ¶ 27.)

- Paster and Maid, who are white, treated [P]laintiff's comparators, the few white and African NHS employees with distinct preference over [P]laintiff and others.  (Id. ¶ 28.)

- Similarly, [P]laintiff's race was a determinative factor as the few NHS employees who are or were [P]laintiff's comparators that are white or African received significantly better treatment from Paster and Maid.  (Id. ¶ 29.)

- It is also significant that [P]laintiff had a long and successful career at NHS until she came under the supervision of Maid and Paster who are white and who have a history of racism as amply documented in Lora v. NHS, Civ. No. 12-2357.  Simply put, throughout her nine year employment with NHS, Inc., [P]laintiff's supervisors were African American and only when she came under the supervision of two white managers, Paster and Maid, did [P]laintiff experience detrimental actions because of her race.  (Id. ¶ 30.)

- Most of [P]laintiff's career at NHS was under the supervision of African Americans including NHS employees Ray Davies, Carmen Hubbard and Nicola Brooks.  Plaintiff never experienced hostility, discrimination or retaliation from these managers.  (Id. ¶ 31.)

---

[15] Paragraph 20(d) in the Complaint also contains a footnote which reads as follows:  "In Lora v. NHS, Civil No. 12-2357 two of plaintiff Ford-Greene's former colleagues at NHS Inc.'s BHRS program brought claims under the same laws and against the same decision makers as plaintiff does here."  (Compl. ¶ 20(d) n.1.)

- Plaintiff avers that [D]efendant NHS, Inc.'s employees Maid, Paster and Wagner[16] routinely did not want or need to meet with her, to not properly or even adequately inform her in a supervisory setting what was it, if anything, in her professional behavior that was not up to par, all in a frequent, severe and pervasive manner.  Plaintiff avers that this treatment was due to Maid, Paster and Wagner's dislike of Plaintiff's race.  (Id. ¶ 34.)

- At that time causally related to [P]laintiff's engagement in protected conduct, NHS and the individual defendants then retaliated against [P]laintiff when they forced on [P]laintiff the adverse actions, including termination, which had no legitimate basis other than deterring the [P]laintiff and others from opposing the blatant racist practices that are normal at NHS, Inc[.] and which is described in the adverse employment averred in paragraphs Nos. 20 (a-g), 26, 34, 37 and 40 (a-c) of this complaint which are incorporated as if stated here at lenght [sic].  (Id. ¶ 45.)

### 1.  Plaintiff's Reference to Other Cases

Defendants argue that "the references in the Complaint to separate lawsuits that have been previously initiated by others against Defendant are impertinent, immaterial and prejudicial, and should be stricken as they have no bearing on the issues raised by the Plaintiff in this case." (Defs.' Mem. Supp. Mot. Dismiss 24.)  In response, Plaintiff argues that her claims "must be reviewed with the record as a whole picture because discrimination is a pattern that appears in a whole story, not through individual events . . . [and] [t]he fact that so many employees of color at NHS, including Ms. Ford, Ms. Lora and Ms. Palma have complained of discrimination in employment provides that better exposed whole picture."  (Pl.'s Resp. Opp'n Mot. Dismiss 10–11.)  Plaintiff incorrectly relies on Third Circuit decisions permitting a "whole picture" analysis

---

[16] It is not clear from the Complaint who "Wagner" is or what role he or she is alleged to have played.

within an individual case[17] as providing a license to allow "incorporations of parts of the judicial record in this same courthouse into the record of Ms. Ford's complaint."  (Pl.'s Resp. Opp'n Mot. Dismiss 10–11 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997) and Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990)).)  But as Defendants point out, in addition to the prejudice from Plaintiff's reference to those cases, their inclusion in the Complaint serves little purpose "as both the Philadelphia Court of Common Pleas and [the Eastern District of Pennsylvania] dismissed any such claims with prejudice."[18]  (Defs.' Mem. Supp. Mot. Dismiss 24.)  Thus, in addition to being prejudicial and irrelevant to this case, those cases tell a different "story" than what Plaintiff would have this Court believe.  Defendants are correct that those cases are "immaterial to this action, relate to individuals who are not parties to this lawsuit, involve separate disputed controversies all of which were dismissed in NHS' favor[,] and provide no evidentiary support to Plaintiff's claims."  (Defs.' Reply Br. 8.) Accordingly, Footnote 1 to Paragraph 20(d) as well as the first sentence of Paragraph 30 shall be stricken from the Complaint.

---

[17] See Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997) ("While each piece of evidence alone is not sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient.  Thus, while we will discuss each piece of evidence, and [defendant's] objections to them, in turn, we must determine whether the evidence is sufficient based on the whole picture.") (citing Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir.1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")).  As these statements are in reference to either a single plaintiff in a lawsuit, or to two plaintiffs in the same lawsuit, Plaintiff's interpretation is simply not correct.  Plaintiff cannot incorporate "parts of the judicial record" from other lawsuits into her Complaint.

[18] (See Defs.' Mem. Supp. Mot. Dismiss 24 (citing Palma v. Brooks, et al., CCP Philadelphia, July Term 2010, No. 03208 (dismissing case on summary judgment); Lora v. NHS, Inc., 2012 Phila. Ct. Com. Pl. LEXIS 239, *22 (Pa. C.P. 2012) (dismissing complaint); Lora v. NHS, Inc., No. Civ.A. 12-2357, 2014 WL 2134589, at *7, *8 (E.D. Pa. May 22, 2014) (entering default judgment for repeated discovery abuses and sanctioning plaintiffs' counsel).)

2. __Plaintiff's Allegations of Pattern and Practice, Hostility, and Severe and Pervasive Conduct__

Defendants argue that Plaintiff's allegations regarding a pattern and practice of racism at NHS must be stricken because, in addition to other reasons, such allegations were not included in Plaintiff's PHRC charge and Plaintiff should not now be permitted to try to establish "pattern and practice" when the PHRC did not address that type of claim.  (See Defs.' Mem. Supp. Mot. Dismiss 24.)  Plaintiff argues that the "stories" of other cases "show that NHS, specifically under its autism unit under these specific white managers including Paster and Maid is a racially hostile, discriminatory, retaliatory and under-paid work experience for women of color such as plaintiff and Ms. Lora as well as Ms. Palma and several others."  (Pl.'s Resp. Opp'n Mot. Dismiss 11.)  In response, Defendants argue that the allegations in those paragraphs "are simply an effort by Plaintiff to poison the well against Defendants by alleging that Defendants somehow previously violated federal laws with regard to Hispanic employees."  (Defs.' Reply Br. 8.)

As previously discussed, the allegations which specifically reference other lawsuits are being stricken from the Complaint.  The allegations which refer to a "pattern and practice" of discrimination, "hostility," conduct that is "severe" or "pervasive," or that discrimination is "normal" at NHS, are not so immaterial that they must be stricken from Plaintiff's Complaint, nor do they rise to the level of being scandalous.  While Plaintiff's hostile work environment claims are being dismissed, the allegations in the Complaint that were intended to support those claims are nonetheless related to Plaintiff's remaining discrimination claims.  Accordingly, Paragraphs 20(d)[19], 31, 34, and 45[20] shall not be stricken from the Complaint.

---

[19] As stated above, Footnote 1 to Paragraph 20(d) shall be stricken from the Complaint, even though Paragraph 20(d) itself may remain.

### 3.   Certain of Plaintiff's Allegations About Defendants Paster and Maid

Defendants also urge the Court to strike allegations about Defendants Paster and Maid which assert that they "'have a history of racism as amply documented in Lora v. NHS,'" and which "are utterly scandalous in relations [sic] to two women who have devoted their lives to helping children in the non-profit human services field."  (Defs.' Mem. Supp. Mot. Dismiss 24 (quoting Compl. ¶ 30.)  As previously stated, the first sentence of Paragraph 30 is being stricken because of its reference to other lawsuits.  But the allegations in Paragraphs 27, 28, 29, 34, and the second sentence of Paragraph 30 do not rise to the level of being scandalous for purposes of a motion to strike when they are viewed in the context of Plaintiff's aiding and abetting claims of racial discrimination against Defendants Paster and Maid.  Accordingly, those Paragraphs may remain in the Complaint, with the exception of the first sentence of Paragraph 30.

## IV.    CONCLUSION

In light of the foregoing, Defendants' Motion to Dismiss is granted in part and denied in part.  With respect to Count One, the failure to promote and hostile work environment claims are dismissed with prejudice, the intimidation and disenfranchisement claims are dismissed without prejudice, and the termination claim may remain.  With respect to Count Two, the failure to promote and hostile work environment claims are dismissed with prejudice, the intimidation and disenfranchisement claims are dismissed without prejudice, and the aiding and abetting termination claim may remain.  The failure to promote claim in Count Three is dismissed with prejudice.  Defendants' Motion to Dismiss Count Four is denied.  Defendants' Motion to Dismiss Counts Six and Seven is granted, and those claims are dismissed without prejudice.

---

[20] While Paragraph 45, in reference to Plaintiff's retaliation claims, contains the phrase "other than deterring the [P]laintiff and others from opposing the blatant racist practices that are normal at NHS, Inc[.]," the reference to "others" does not necessarily imply that there are plaintiffs in other lawsuits and so that language may remain in the Complaint.

Defendant's Motion to Strike is granted with respect to Footnote 1 of Paragraph 20(d) and the first sentence of Paragraph 30, and is denied with respect to the body of Paragraph 20(d), the second sentence of Paragraph 30, and Paragraphs 27, 28, 29, 31, 34, and 45.

An appropriate Order follows.